# EXHIBIT A

FILED
4/5/2018 3:04 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Victoria Angeles

CIT PPS - SAC 3

CAUSE NO. __2018CI06272__

| | | |
|---|---|---|
| PHILLIP M. HEWSON | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 150th   JUDICIAL DISTRICT |
| | § | |
| PEPPERIDGE FARM, INC. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES PHILLIP M. HEWSON, Plaintiff, and files this his Plaintiff's Original Petition, complaining herein of Defendant, PEPPERIDGE FARM, INC., and would respectfully show the Court as follows:

### Amount in Controversy and Discovery Level

I.

Plaintiff seeks monetary relief over $200,000.00 but not more than $1,000,000.00. The amount sought is within the jurisdictional limits of this court.

II.

Discovery in this case should be conducted pursuant to Tex. R. Civ. P. 190.3 (Level 2).

### Parties and Venue

III.

Plaintiff, PHILLIP M. HEWSON ("HEWSON"), is an individual residing in Bexar County, Texas.

Defendant, PEPPERIDGE FARM, INC. ("PF"), is a Connecticut corporation, authorized to do business in Texas, and may be served with process by serving its

registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201-4234.

IV.

Pursuant to Section 15.002(a)(1) of the Texas Civil Practice & Remedies Code, venue is proper in Bexar County, which is the county in which all or a substantial part of the events or omissions giving rise to this claim occurred.

### Background Facts

V.

On or about November 10, 2014, HEWSON and PF entered into a Consignment Agreement whereby HEWSON was granted an inclusive distributorship for PF's food products within a defined geographic territory. A true and correct copy of the Consignment Agreement is attached hereto as Exhibit "A" and incorporated herein by reference. HEWSON's territory is depicted on an attachment to the Consignment Agreement, and may be generally described as North Central/Northwest Bexar County, extending into Comal County and Kendall County, Texas. Under the terms of the Consignment Agreement, HEWSON has the exclusive right to distribute PF's food products to retail stores within his territory.

VI.

Pursuant to paragraph 20 of the Consignment Agreement, PF has the right to purchase "all or any portion" of the distributorship back from HEWSON upon written notice to HEWSON. Paragraph 20 of the Consignment Agreement further provides as follows:

> If Bakery [PF] elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee [HEWSON] a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery. The determination of fair market value by the majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this paragraph.

VII.

On or about February 9, 2018, PF notified HEWSON in writing that it was purchasing "all existing and future club rights within your Distributorship." PF described "club rights" as HEWSON's right to sell PF's food products to retail stores within HEWSON's territory "commonly (though not necessarily) dedicated to large sizes and

3

bulk sales to consumers who may be required to pay a membership fee to shop therein (*e.g.*, Costco, Sam's Club, B.J.'s etc.)."

## VIII.

After receiving PF's notice, HEWSON attempted, through counsel, to negotiate a price representing the fair market value of his right to service club stores with in his territory. HEWSON and PF have been unable to agree upon a price; therefore, HEWSON seeks to enforce the arbitration provisions of paragraph 20 of the Consignment Agreement.

## Relief Requested

## IX.

HEWSON requests that the Court order PF to arbitrate pursuant to the provisions of paragraph 20 of the Consignment Agreement. HEWSON further requests that the Court order PF to agree to a reasonable schedule for disposition of the arbitration; in the alternative, if PF refuses to agree to a reasonable schedule, then HEWSON requests that the Court establish a schedule. The schedule should include deadlines for:

1. Each party's designation of an arbitrator.
2. Agreement by the two arbitrators upon a third arbitrator.
3. Exchange of witness lists with expected testimony of witnesses, and exhibits.
4. A date for the arbitration.
5. A deadline for the arbitrators' ruling.

HEWSON further requests that when the arbitrators have made a decision, this Court enter a judgment against PF on the arbitration award in the amount of fair market value

of HEWSON's right to service club stores, as determined by the arbitrators, plus an additional 25 percent of the fair market value.

X.

HEWSON further seeks to recover attorney's fees incurred in connection with this suit, pursuant to Section 38.001 et seq. of the Texas Civil Practice & Remedies Code, including appellate attorney's fees.

XI.

All conditions precedent to this action have been performed or have occurred.

WHEREFORE, HEWSON respectfully prays that he have the following relief:

1. An order to arbitration and an arbitration schedule as described herein.
2. A judgment confirming the arbitrators' award.
3. Attorney's fees.
4. Costs of suit.
5. Pre-judgment and post-judgment interest on the judgment confirming the arbitration award.
6. Such other and further relief to which HEWSON may be justly entitled.

Respectfully submitted,

CURL STAHL GEIS
A PROFESSIONAL CORPORATION
700 North St. Mary's Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 226-2182
Telecopier: (210) 226-1691

BY: __/s/ Paul T. Curl__
   PAUL T. CURL
   State Bar No. 05255200
   ptcurl@csg-law.com
   HERBERT S. HILL
   State Bar No. 24087722
   hshill@csg-law.com
   DANIELLE N. RUSHING
   State Bar No. 24086961
   dnrushing@csg-law.com

ATTORNEYS FOR PLAINTIFF

2001

# PEPPERIDGE FARM

# CONSIGNMENT AGREEMENT

\* \* \*

### PEPPERIDGE FARM, INCORPORATED
### 595 WESTPORT AVENUE
### NORWALK, CONNECTICUT 06851-4482

### HEREBY GRANTS

### AN

### EXCLUSIVE DISTRIBUTORSHIP

### TO

NAME:     PHILLIP M. HEWSON

ADDRESS:  15050 PASTURA PASS
          HELOTES, TX 78023

### AS A
### CONSIGNEE
### WITHIN THE TERRITORY AND UPON THE
### TERMS STATED IN THE FOLLOWING PAGES

CA01

**EXHIBIT "A"**

## DEFINITIONS

(a) BAKERY – refers to PEPPERIDGE FARM, INCORPORATED, the grantor of the Distributorship, a Connecticut corporation having its principal office in Norwalk, Connecticut.

(b) CONSIGNEE – refers to the grantee of this Distributorship identified on the cover page hereof.

(c) TERRITORY – refers to the territory described in Schedule A hereto.

(d) CONSIGNED PRODUCTS – refers to those products listed in Schedule B hereto (subject to modification per Paragraph 10) but only when packaged or wrapped in retail packaging under the brand name "Pepperidge Farm" and sold or intended to be sold to retail stores as fresh (i.e., not preserved or stale), first quality (i.e. not Seconds) merchandise and does not include (1) any of such products sold, or intended to be sold to retail stores, frozen, refrigerated, canned, or otherwise preserved, (2) any of such products sold, or intended to be sold, to retail stores in a raw or uncooked state, (3) any of such products sold, or intended to be sold, to retail stores in bulk for resale by such retail stores at an in-store bakery or at a food-service counter or food-service section located within such retail store, (4) Stale Products, (5) Seconds, (6) merchandise of others containing Consigned Products as components, (7) any of such products packaged or wrapped in food-service or other non-retail packaging or (8) any of such products packaged, wrapped or sold under any brand name other than "Pepperidge Farm."

(e) STALE PRODUCTS – refers to Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time.

(f) SECONDS – refers to Consigned Products which do not meet the high standards required by Bakery for distribution in the ordinary manner and thus are deemed by Bakery, in its sole discretion, to be unsuitable for that purpose.

(g) DISTRIBUTION OR DISTRIBUTE – refers to the sale and delivery of Consigned Products to retail stores within the Territory and to such hotels, restaurants, etc., as may be authorized by Bakery per Paragraph 9.

(h) BULLETIN PRICES – refers to the prices for Consigned Products charged by Bakery and published from time to time.

(i) CHAIN – refers to any person, firm, corporation or other legal entity that owns or operates three or more retail stores.

(j) DISTRIBUTORSHIP – refers to the distribution rights described in, and established under, this Agreement.

## TERMS

1. EXCLUSIVENESS OF DISTRIBUTORSHIP. Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3 (b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery. The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

2. QUANTITIES CONSIGNED. Bakery will consign and deliver to Consignee at such locations as shall, from time to time, be designated by Bakery, and Consignee will accept sufficient quantities of Consigned Products to maintain at all times an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production. Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery. Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered by Consignee to a purchaser. Consignee shall not encumber or grant any security interest in or lien on, or by action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon, the Consigned Products.

3. PROCEEDS AND RECORDS OF SALE.

(a) Except as provided in subparagraph (b), Consigned Products shall be consigned to Consignee at Bulletin Prices, less the percentage specified in Schedule B, for sale and delivery to retail stores at such prices as Consignee may determine.

(b) Bakery may bill directly any Chains and military commissaries that have requested such direct billing or that request it in the future. Such directly billed stores in the Territory will be direct customers of Bakery, and Consignee will solicit sales from them and receive product for delivery to them on Bakery's behalf at Bulletin Prices. Bakery assumes all credit risks with respect to Chains and military commissaries which receive such direct billing. The funds owed by such Chains and military commissaries as a result of the Consigned Products delivered are accounts receivable of, and debts payable to, Bakery and are not the property of Consignee. Consignee shall have the exclusive right to perform the service of delivery of Consigned Products to such customers of Bakery and Bakery shall not effect such delivery except through Consignee, subject to the provisions of Paragraphs 1, 6, 7, and 9. For the performance of his/her services of solicitation and delivery under this subparagraph (b), Consignee, if he/she shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d) (2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

(c) Bakery may from time to time extend credit to Consignee for Consigned Products to be sold to retail stores on credit extended by Consignee; provided Bakery has approved in advance the stores to receive such credit and the amount and terms thereof. Notwithstanding the foregoing, any credit extended by Consignee shall be at Consignee's risk.

(d) (1) Consignee shall pay promptly each week on the day specified by Bakery for all Consigned Products sold and delivered by Consignee during the preceding week, less any amounts which would be otherwise due on such sales as to which Bakery shall have extended credit to Consignee under (c) above, plus any amounts becoming due during such week under the terms of credit extended during any previous week.

(2) Consignee shall promptly deliver to Bakery on such days as Bakery may specify all charge tickets for all deliveries of Consigned Products to direct customers of Bakery for direct billing by Bakery.

(e) Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may from time to time reasonably request; Bakery may inspect such records and Consigned Products at such times as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of his/her operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

4. DISTRIBUTION EFFORTS. Consignee will use his/her best efforts to realize the full sales potential of the Territory for Consigned Products. To this end, Consignee will (a) actively solicit all retail stores in the Territory whose accounts can by profitably handled, (b) maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service. Consignee may sell or distribute other products, not competitive with Consigned Products, so long as such sale or distribution does not otherwise violate any terms or conditions of this Agreement or interfere with Consignee's performance of his/her obligations under the terms of this Agreement. Bakery may, from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship, and Consignee shall either meet or exceed such goals.

5. DISTRIBUTION SERVICE AND FACILITIES. Consignee will maintain efficient distribution service throughout the Territory in keeping with the established reputation of Bakery and the high quality of its products. To this end, Consignee will (a) provide adequate equipment and, if not otherwise provided by Bakery, facilities for the receipt, handling and delivery of Consigned Products and the accounting, inventory and billing thereof, including, without limitation, such computer and/or other systems as may be necessary or appropriate therefor, (b) comply with all laws and regulations relating either directly or indirectly to the operation or ownership of the Distributorship, including, without limitation, all motor vehicle, food, drug, health and sanitary laws and regulations and (c) maintain such route books and other records as are required by Bakery from time to time. Pursuant to the foregoing, Consignee shall provide, and shall maintain in good and proper working condition and appearance, a delivery truck, computer and such other equipment as, from time to time, shall be necessary for the operation of the Distributorship. Consignee shall maintain the general appearance and condition of such truck, computer and other equipment, as well as Consignee's appearance and deportment and that of his/her helper or helpers, if any, in accordance with the established reputation of Bakery and the high quality of its products.

6. EMERGENCY SERVICE. If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time to provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements at his/her own expense for the provision and/or maintenance of such service; but if Consignee is unable or fails to do so, Bakery is authorized in its discretion to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk. Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7. FAILURE TO SERVICE PARTICULAR STORES. If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

8. CHAIN STORE ACCOUNTS. If any Chain requires that authorization for the distribution of Consigned Products to the Chain's retail stores in the Territory shall be obtained through a central or district office located outside of the Territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, Bakery will cooperate with Consignee in procuring such authorization. If any Chain refuses to pay or to permit store managers to pay any Consignee directly for Consigned Products and, instead, requires the submission of a consolidated bill to a central or district office of the Chain, Bakery will handle the billing, and the terms of Paragraph 3 (b) shall apply.

9. PROHIBITED SALES AND DELIVERIES. Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any Chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the best efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion

CA01

to sell and deliver the Consigned Products directly to such Chain for its own account via such warehouse deliveries, as long as such refusal remains in effect. In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

10. MODIFICATION OF LIST PRODUCTS. The list of Consigned Products set forth in Schedule B hereto may be modified or changed by Bakery from time to time by (a) adding such other products as it may deem advisable among those which it now or hereafter produces, (b) withdrawing within any sales district or other geographic area any Consigned Products (whether originally listed or subsequently added) which it discontinues producing or which it discontinues selling in such sales district or other geographic area or (c) adding or withdrawing at any time with or without notice and for any reason any product designated as "test product," "for market test" or the like. In addition, Bakery shall have the right from time to time to change the ingredients, the method of production or the labeling or packaging of any Consigned Products. In addition, if Consignee fails to comply with the terms and conditions of this Agreement with respect to any Consigned Product or Consigned Products, then Bakery may, in addition to any other remedies available to it hereunder, if such failure shall continue for a period of thirty days after written notice thereof from Bakery, without compensation or remuneration to Consignee, delete such Consigned Product or Consigned Products from Schedule B, in which event Consignee's right to distribute such deleted Consigned Products under the terms of this Agreement shall immediately terminate.

11. SALES DATA. Consignee will furnish to Bakery such sales data as it may reasonably require for the planning of its production schedules, the expansion of its operations and the planning and conduct of sales promotion programs.

12. TRADE NAME, ETC. Consignee may use Bakery's trade name, trademark and distinguishing colors on his/her truck and other equipment and supplies; provided, however, that (a) Bakery's trade name may not be used as a part of any business name or trade name of Consignee without the written consent of Bakery or in any other way which will tend to confuse the separate identities of Bakery and Consignee, and (b) Bakery shall have the right at any time to revoke the permission granted in this Paragraph if, in its opinion, the general appearance of Consignee's truck or other equipment or his/her own general appearance or deportment or that of his/her helper or helpers, if any, shall fall below standards in keeping with the established reputation of Bakery and the high quality of its products.

13. INSURANCE AND INDEMNIFICATION. Consignee shall, at Consignee's expense, maintain adequate public liability, property damage and, where appropriate, workers' compensation insurance to protect Bakery and Consignee against any and all claims of personal injury, death or property damage, other than damage to Consigned Products in possession of Consignee. Such insurance shall be in such amounts and have such limits as shall be acceptable to Bakery or required by the retail stores in the territory, whichever is greater, shall name Bakery as an additional insured thereunder and shall provide that the insurance may not be terminated without at least fifteen (15) days' prior written notice to Bakery. Consignee shall, prior to the date of execution of this Agreement, and at least annually thereafter, provide Bakery with insurance certificates evidencing such coverage. If Consignee fails to obtain or to maintain the insurance coverage required by this Paragraph, Bakery may, at its option, purchase such insurance coverage on behalf of Consignee, and Consignee shall reimburse Bakery in full for the cost thereof. Consignee covenants and agrees to indemnify, defend and save Bakery harmless from and against any and all claims relating to payroll, unemployment compensation, employee benefits, personal injury, death, or property damage (other than damage to Consigned Products in the possession of Consignee) caused or alleged to have been caused directly or indirectly by or as a result of the actions of Consignee or his/her helper or helpers, if any, or by or as a result of the operation of the Distributorship or any vehicle or equipment owned or used by Consignee or his/her helper or helpers, if any, and any and all losses, damages, liabilities and expenses (including attorney's fees) incurred by Bakery as a result thereof. Anything in this Agreement to the contrary notwithstanding, this indemnification provision shall survive any termination of this Agreement.

14. NON-PERFORMANCE FOR REASONS BEYOND CONTROL. Neither Bakery nor Consignee shall be liable for any failure to comply with the terms of this Agreement if such failure shall have been caused primarily by fire, labor dispute, strike, war, insurrection, governmental restriction or any other cause beyond the control of the party so failing.

15. INDEPENDENT BUSINESSMAN. Consignee is a self-employed independent businessman, not an agent or employee of Bakery, and has no authority other than to distribute products consigned hereunder and to solicit orders for and make deliveries of Consigned Products in the case of direct sales of Bakery under Paragraph 3 (b), express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon Bakery or for which it will be responsible, and Consignee will refrain from any conduct inconsistent with the terms of this Paragraph 15. Consignee may, at Consignee's own expense and risk, employee such persons as Consignee shall deem appropriate to assist in the performance of Consignee's obligations under this Agreement; and Consignee shall be responsible for the hiring, firing, training and supervision of, and all remuneration and benefits for, any person so employed. The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement. The discount percentage and commission rates described in Paragraph 3 and the percentages established in Schedule B or any similar schedule under this Agreement are based in substantial part on such independent contractor relationship and the understanding that the Bakery is not obligated to pay any FICA, income or similar tax or withholding for or on behalf of the Consignee.

16. LIEN OF BAKERY ON DISTRIBUTORSHIP. Bakery shall have a first lien on the Distributorship and all proceeds of the Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding. Any sale, transfer or assignment of the Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing. Consignee shall not, without the prior written consent of Bakery, encumber or grant any security interest in or lien upon, or by his/her action or inaction cause or allow any encumbrance, security interest or lien to be imposed

CA01

upon the Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance or security interest to the lien created by this Paragraph 16. Bakery's consent to any such encumbrance, security interest or lien which has been so subordinated to the lien of Bakery established pursuant to this Paragraph 16 shall not be unreasonably withheld.

17. RIGHT OF FIRST REFUSAL. Consignee must give Bakery written notice of each proposed sale, conveyance or transfer (hereinafter "proposed sale") of all or any portion of the Distributorship, which notice shall identify the prospective purchaser and the terms and conditions of the proposed sale. Such notice of proposed sale from Consignee shall be deemed to be an irrevocable offer to sell the Distributorship, or the portion thereof described in such notice of proposed sale, to Bakery on the terms and conditions set forth therein. Bakery shall have the right, but not the obligation, to accept such offer by giving Consignee written notice of acceptance within thirty days of the later of (i) Bakery's receipt of Consignee's written notice of proposed sale, or (ii) Bakery's receipt of the full and complete application of the prospective purchaser, including all requested financial and credit information (which right is hereinafter referred to as the "Right of First Refusal"). Such notice of acceptance from Bakery shall be deemed to be an acceptance of Consignee's offer of sale, and the sale of the Distributorship, or the portion thereof offered for sale, by Consignee to Bakery, on the terms set forth in the notice of proposed sale, shall be consummated at a closing to be held within thirty days of such notice of acceptance. Bakery's failure or refusal to exercise any Right of First Refusal hereunder does not constitute, and shall not be deemed to be, an approval by Bakery of the proposed sale or the proposed purchaser. Any change in the identity of the proposed purchaser or in any terms of any proposed sale from those identified in any notice from Consignee to Bakery hereunder shall be deemed to be a new proposed sale with respect to which Consignee must give Bakery a new notice and a new Right of First Refusal in accordance with the terms of this Paragraph 17.

18. SALE OF DISTRIBUTORSHIP. The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery. Bakery will grant such approval with respect to a proposed sale if (i) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale and (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen adequate facilities and involvement in the business, provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery. In addition, where such proposed sale involves the division of the Territory or the sale of only a portion of the Distributorship, such proposed sale is subject to, and may not be effected without, Bakery's prior written approval of the division of Territory sought to be effected thereby. Bakery will notify Consignee with reasonable promptness of its approval or disapproval of any proposed sale and, if applicable, of any proposed division of the Territory. Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of the Distributorship, as a whole or in part, without such written approval shall be void. Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of this Distributorship, as a whole or in part, on terms that are different from those set forth in, or to a party different from the proposed purchaser identified in, the notice of proposed sale given Bakery pursuant to the terms of Paragraph 17 shall be void. Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in his/her account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

19. TERMINATION OF CONSIGNMENT AGREEMENT FOR CAUSE. Bakery, in addition to all other remedies available to it at law or equity and to the extent permitted by law, shall have the right in its discretion to terminate this Agreement at any time, upon written notice to Consignee, for any of the following causes:

(a) failure of Consignee adequately to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy from Bakery;

(b) failure of Consignee to perform or comply with any material term or provision of this Agreement and the continuance of such failure for seven (7) days after written notice thereof from Bakery;

(c) failure of Consignee to maintain the general appearance and condition of his/her truck or other equipment or his/her own general appearance or deportment or that of his/her helper or helpers, if any, in accordance with standards in keeping with the established reputation of Bakery and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from Bakery;

(d) any repeated failure of the type described in any of subparagraphs (a) through (c) above, even though a previous failure or failures may have been corrected after notice;

(e) any dishonesty of Consignee in his/her dealings with Bakery or with others in connection with Consignee's distribution services under this Agreement;

(f) any actions, activities or practices of Consignee which either do, or in the opinion of Bakery are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation with consumers, retail stores or any other purchaser of Consigned Products;

(g) Consignee's insolvency or admission in writing of his/her inability to pay his/her debts as they mature;

(h) the filing of voluntary bankruptcy petition by Consignee or his/her failure to vacate an involuntary bankruptcy petition within sixty days after date of filing;

CA01

    (i) failure of Consignee to vacate the appointment of a receiver or trustee of Consignee's business or assets within sixty days after the date of appointment; or

    (j) a general assignment by Consignee for the benefit of his/her creditors.

Termination of this Agreement and the Distributorship pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except Consignee's right to receive compensation therefor in accordance with the established business practices of Bakery, and each party's right to receive any favorable balances and obligation to pay any adverse balances.

20. BAKERY'S OPTION TO BUY DISTRIBUTORSHIP. Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship at any time upon written notice to Consignee. Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below. Bakery may begin operating the Distributorship, or the portion being purchased, for its own account on such date. If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery. The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph. Notice of purchase pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the rights and obligations with respect to payment and arbitration stated in this Paragraph.

21. TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE. Consignee shall have the right in his/her discretion to terminate this Agreement at any time upon thirty days written notice to Bakery. Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

22. DEATH OF CONSIGNEE. In case of Consignee's death, all terms of this Agreement (see particularly Paragraph 6) shall continue in effect during the next ninety days, and shall inure to the benefit of and be binding upon the legal representatives of Consignee's estate during such period. If the legal representatives of Consignee's estate shall not have sold the Distributorship pursuant to Paragraph 18 within such ninety day period, all rights and obligations hereunder of both Bakery and Consignee's estate shall terminate at the expiration of such period except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the right of Consignee's estate to receive and the obligation of Bakery to pay to Consignee's estate the entire proceeds (subject, however to Bakery's lien per Paragraph 16) of any sale of the Distributorship (in whole or in part) made or contracted to be made by Bakery within the next ninety days; provided, however, that if Bakery shall have provided distribution services within all or any portion of the Territory during all or any portion of the period from the expiration of the first ninety day period to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services. If Bakery provides emergency distribution services under Paragraph 6 during all or any portion of the first ninety day period, any excess of its income over expense in providing such service shall be paid to Consignee's estate (subject to any right of set-off that may exist), but Consignee's estate shall not be liable to Bakery for any excess of its expense over income in providing such services, although any such excess may be deducted from the proceeds of sale.

23. TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE. Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee. Upon termination pursuant to this Paragraph the Bakery will pay to the Consignee a sum equal to (a) the fair market value of the Distributorship on the termination date plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery. The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph. Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph. This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of a termination of this Agreement without cause.

24. WITHHOLDING PRODUCT. Upon Consignee's failure to fulfill any of his or her obligations under this Agreement or upon the occurrence of any of the events referred to in Paragraph 19, Bakery shall have the right, without thereby terminating this Agreement, immediately to discontinue shipment of Consigned Products to Consignee until such time as Consignee shall have completely remedied such failure or occurrence, and no such discontinuance shall be, or be deemed to be, a waiver by Bakery of any of its rights or remedies under this Agreement or at law or in equity, including without limitation, the right to terminate this Agreement for the same failure or occurrence. Bakery's rights and remedies under this Paragraph shall be in addition to, and may be exercised concurrently with, all other remedies available to it under this Agreement or at law or in equity.

25. NOTICES. All notices which are required to or which may be given under the terms hereof shall be in writing and shall be deemed given when deposited in the United States mails, postage prepaid, and addressed to the other party at the address designated for such party on the cover page hereof. Either party may change such address by giving notice of a new address.

26. DURATION OF CONSIGNMENT AGREEMENT. This Agreement shall continue in effect until terminated in the manner provided in Paragraphs 19, 21, 22 or 23, until Bakery has given Consignee written notice of Bakery's election to purchase all or any portion of the Distributorship, as provided in Paragraph 20, or until Bakery has purchased all or any portion of the Distributorship pursuant to the Right of First Refusal, as provided in Paragraph 17. In the event that Bakery has given Consignee written notice of its election to purchase a portion of the Distributorship as provided in Paragraph 20 or if Bakery has purchased a portion of the Distributorship pursuant to the Right of First Refusal as provided in Paragraph 17, the parties shall promptly enter into a new Consignment Agreement in substantially the form hereof, except for the modification of the Description of Territory in Schedule A to reflect such purchase.

27. GENERAL. The terms of this Agreement shall be construed so as to carry into effect its true intent and meaning, and any ambiguities shall be construed and any inconsistencies shall be reconciled accordingly. Any consent, permission, authorization or waiver given hereunder with respect to any continuing act or condition may be subsequently revoked in the same manner as given. Except as expressly set forth herein, this Agreement may not be assigned by Consignee.

28. ENTIRETY OF CONSIGNMENT AGREEMENT. This Agreement represents the entire agreement between Bakery and Consignee and supersedes any and all prior franchises, agreements or understandings between Bakery and Consignee, whether written or oral, regarding distribution of Consigned Products. This Agreement may not be amended orally or by custom or conduct but only by a writing signed by both Bakery and Consignee.

Dated at Norwalk, Connecticut    NOVEMBER 10, 2014

PEPPERIDGE FARM, INCORPORATED

This Consignment Agreement is
accepted upon the terms stated above.

_____
PHILLIP M. HEWSON, Consignee

By: _____
ERIN PULITO

Its: _____
DIRECTOR
DISTRIBUTOR & MARKET DEVELOPMENT

CA01

Schedule A

Description of Territory

In the state of Texas and all that territory more fully described as follows:

Note: Route customer's establishments "fronting" on any thoroughfare or boundary as described herein (unless specified otherwise) are deemed to belong to this territory.

Beginning at the intersection of Interstate Highway 10 and FM 473; thence east on FM 473 to US Highway 281; thence south on US Highway 281, excluding all route customers on the east side, to the Comal/Bexar County Line; thence west on the Comal/Bexar County Line, excluding all route customers on the south side, to Ralph Fair Rd (FM 3351); thence south on Ralph Fair Rd (FM 3351) to Salado Creek; thence southeast on Salado Creek, excluding all route customers on the east side, to State Loop 1604; thence west on State Loop 1604, excluding all route customers on the south side, to I 10; thence south on I 10, excluding all route customers on the east side, to Interstate Loop 410; thence west on Interstate Loop 410, excluding all route customers on the south side, to Evers; thence northwest on Evers, excluding all route customers, to Wurzbach Rd; thence northeast on Wurzbach Rd, excluding all route customers, to Fredericksburg Rd; thence north on Fredericksburg Rd, excluding all route customers, to Prue Rd; thence west on Prue Rd, excluding all route customers, to State Highway 16 / Bandera Rd; thence northwest on State Hwy 16 / Bandera Rd, excluding all route customers on the southwest side, to Quincy Lee Dr; thence northeast and northwest on Quincy Lee Dr, excluding all route customers, to State Loop 1604; thence southwest on State Loop 1604, excluding all route customers on the southeast side, to State Hwy 16 / Bandera Rd; thence northwest on State Hwy 16 / Bandera Rd, excluding all route customers on the southwest side, to State Highway 46; thence northeast on State Highway 46, excluding all route customers, to the Bandera/Kendall county line; thence northwest on the Bandera/Kendall county line to the Kerr/Kendall county line; thence north on the Kerr/Kendall county line to Holiday Rd (Flach Ranch); thence northeast on Holiday Rd (Flach Ranch), excluding all route customers, to Below Rd; thence southeast on Below Rd, excluding all route customers, to Big Joshua Creek Rd; thence northeast on Big Joshua Creek Rd, excluding all route customers, to US Highway 289; thence northwest on US Highway 289, excluding all route customers, to Interstate Highway 10; thence northwest on Interstate Highway 10, excluding all route customers, to FM 473, the point of the beginning.

Notwithstanding anything in the Consignment Agreement or in the foregoing description of Territory to the contrary, the Territory shall not include and the Consignee shall have no right to distribute Consigned Products to any customers that require distribution of Consigned Products via warehouse deliveries pursuant to Paragraph 9 of the Consignment Agreement, including the following stores located in the Territory or any successor to or assign of any such stores.

Approved: November 10, 2014                                Pepperidge Farm Incorporated

_/s/ Phillip M. Hewson_____                                By: _____
Phillip Hewson                                             Erin Pulito – Director
Consignee                                                  Distributor & Market Development

# HEWSON, PHILLIP SPLITTING W/ ROGER EDGE 11-10-14




GOOD IS IN THE DETAILS.

**SCHEDULE B**
**LIST OF CONSIGNED PRODUCTS**
**(SUBJECT TO MODIFICATION PER PARAGRAPH 10)**

**Milano**
7412 Milano
7435 Orange Milano
7472 Double Chocolate Milano
7481 Raspberry Milano
7567 Milk Chocolate Milano
7947 Mint Milano
8735 Amaretto Milano
8736 Black & White Milano
9038 Chocolate Raspberry Milano
9043 Chocolate Mint Milano

**Entertaining - Boxed Cookies**
7233 Distinctive Selection Large (18 ct)
7521 Golden Orchard Assortment
7704 Ginger Family (18ct)
7912 9 Cup Assortment Holiday Shipper (24 CT)
8310 Chocolate Collection

**Entertaining – Pirouettes**
8781 Mint Chocolate Pirouette
8782 Chocolate Fudge Pirouette
8783 Chocolate Hazelnut Pirouette
8784 French Vanilla Pirouette

**Chocolate Drenched**
9006 Milk Chocolate Drenched Milano
9007 Dark Chocolate Drenched Milano
9008 Chocolate Drenched Mint Milano
9009 Chocolate Drenched Milano Shipper

**Gifting**
9021 Holiday Gift Box

**Other Distinctive Bag**
7410 Bordeaux
7419 Geneva
7420 Brussels Mint
7946 Brussels
7952 Butter Chessmen
8908 Tahiti
9042 Chocolate Chessman

**PF Chocolate Chunk – Crispy**
7522 Tahoe
7708 Chesapeake
7712 Sausalito
7713 Nantucket
7860 Double Chocolate Nantucket
9193 Crispy Chocolate Chunk - White & Milk Chocolate
**PF Chocolate Chunk - Soft Baked**
7821 SB Chocolate Chunk – Nantucket
7869 SB Choc Macadamia – Sausalito

**Single Serve Goldfish**
7574 Cinnamon GF Grahams,SS (Each Pouch)
7760 Cheddar Cheese GF, SS (Each Pouch)
7867 Cheddar Cheese Goldfish 2 oz.
8127 Goldfish Colors Carton 2 oz.
8799 Cheddar GF 2.5oz Grab Bag
8800 GF Colors 2.25oz Grab Bag
8801 FB Cheddar 2.25oz Grab Bag
9000 Variety Pack (Cheddar GF/ Pretzel GF/ Minin Nantucket 9ct)
9001 Goldfish Colors 9ct. Multipack (1.1oz Pouch)
9002 Flavor Blasted Xtra Cheddar - 9ct
9003 Cheddar Cheese GF, SS 9ct-1.25 oz
9133 12ct Whole Grain Cheddar GF Multi-pack
9137 9ct Whole Grain Cheddar GF Multi-pack

**Baked Naturals**
8932 Wheat Crisps - Zesty Tomato Herb
8934 Wheat Crisps - Toasted Wheat
8942 Pretzel Thins - Simply Pretzel
8943 Snack Sticks - Artisan Cheese
8947 Snack Sticks - Toasted Sesame
8948 Pretzel Thins - Savory Cheddar
9215 Baked Naturals Pre-packed Shipper

**Snack Sticks**
7802 Pumpernickel
7803 Sesame
7805 Three Cheese

**Distinctive Crackers**
7144 Holiday Quartet DC Shipper (24 CT)
7447 Quartet Cracker Asst.
7477 Golden Butter
7487 Hearty Wheat
8985 Classic Water

**Bag Goldfish**
8089 Holiday - Red & Green Goldfish
8539 Goldfish Colors
8546 Parmesan Cheese
8547 Cheddar Cheese
8550 Original
8554 Low Salt Cheddar
8560 Pizza
8561 Baby Cheddar
8562 Pretzel
8563 Bilingual Cheddar
8564 Calcium
8578 Whole Grain Cheddar GF
8930 Starfish Cheddar
**Flavor Blasted Goldfish**
8548 Flavor Blasted Xtra Cheddar GF
8551 Flavor Blasted Jalapeno Queso GF

7884 SB Oatmeal Raisin - Santa Cruz
8203 SB Dark Chocolate Brownie – Captiva
8206 SB Caramel – Carmel
8469 SB Sugar Cookie
8470 SB Snickerdoodle
8899 SB Oatmeal
8900 SB Milk Chocolate
8901 SB Molasses
9192 SB Chocolate Chunk - White & Milk Chocolate

**Fruit Cookies**
7462 Verona Apricot Raspberry
7464 Verona Strawberry
9058 Verona Apple Caramel
9059 Verona Blueberry
9109 Montieri Peach Tart
9110 Montieri Apple Cinnamon Tart
9111 Montieri Raspberry Tart
9177 Fruit Cookies Prepacked Shipper

**Old Fashioned/Homestyle**
7438 Sugar
7444 Shortbread
7445 Gingermen

**100 Calorie Pack Cookies**
8973 Butter Chessman 100 Calorie Pack
8975 Chocolate Chessman 100 Calorie Pack
8976 Chocolate Chunk 100 Calorie Pack

**Single Serve Cookies**
7515 Milano 2 Pk.
7619 Sausalito
7668 Brussels 2Pk.
7696 Nantucket
7796 Milano 3 Pk., (Each Pouch)
7875 Milano 3 Pk., 9ct Tray (comprised of 7796)
7877 CCC Minis, 9ct tray
8797 Mini Chessman Grab Bag
8798 Mini Nantucket Grab Bag
8854 Dark Chocolate Brownie 2-pack
8855 Soft Baked Oatmeal Raisin 2-pack
8884 Milano 3pk. Grab Bag

8552 Flavor Blasted Nothin' but Nacho GF
8553 Flavor Blasted Xplosive Pizza GF
8886 Flavor Blasted Blazin Buffalo GF

**Goldfish Box**
8172 Extra Cheddar Flavor Blasted Goldfish
8639 Goldfish Colors
8708 Cheddar GF

**Goldfish Box - 18 oz.**
7579 18 oz Cheddar Cheese

**Goldfish Variety Packs**
7523 Goldfish On The Go Cheddar (Pouch)
7615 Goldfish On The Go Cheddar
7639 Goldfish On The Go Variety Pk
7650 Goldfish On The Go Variety Pk (Pouch)

**100 Calorie Pack Goldfish**
8745 Baby Wholegrain Cinnamon 100 Calorie Pack
8748 Baby FB Wholegrain Cheddar 100 Calorie Pack
8749 Baby Wholegrain Cheddar 100 Calorie Pack
8763 Baby Wholegrain Chocolate 100 Calorie Pack
8869 Pretzel 100 Calorie Pack

**Goldfish Novelty Packs**
8392 0.4oz Cheddar GF Pouches
8534 0.4oz pouches FBGF Extra Cheddar

For distribution of the foregoing products to direct billing customers of Bakery under Paragraph 3(b) of this Agreement, Consignee will, subject to the terms of that Paragraph 3(b), be paid a percentage of the net proceeds of such sales paid to Bakery calculated at the rate of 20% of the published prices in effect from time to time for Consigned Products.

APPROVED: NOVEMBER 10, 2014

APPROVED: NOVEMBER 10, 2014

PEPPERIDGE FARM, INCORPORATED

PHILLIP M. HEWSON

By: _____

ERIN PULITO
DIRECTOR
DISTRIBUTOR & MARKET DEVELOPMENT